[Crim. No. 635.   In Bank.—December 14, 1900.]

THE PEOPLE, Respondent, v. HARRY W. CLARKE, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE.—In a prosecution for murder, the evidence, although purely circumstantial, is reviewed and held amply sufficient to sustain a conviction.

ID.—CHARACTER OF SHOTS.—Where the homicide is shown to have been committed inside of a house, by the shooting of the deceased with a shotgun, a witness for the prosecution, who was outside the house at or about the time the shooting is claimed by the prosecution to have occurred, and who testified to the fact of having then heard shots, may further testify that from the

sound of the shots they were made in the house, and sounded like shots fired from a shotgun. The fact that such witness was not an expert cannot be taken advantage of on appeal, in the absence of an objection on that ground at the trial, especially when he testifies to his ability to distinguish by sound between the different kinds of shots.

Id.—Identity of Place.—Where a witness for the prosecution has testified that he was at a particular place when he heard the shots fired, and that a few minutes thereafter he saw the defendant come out of the house, and evidence is offered by the defense that the house was not visible from that place, the witness in rebuttal may testify that he pointed out to other witnesses for the prosecution the place where he was when he heard the shots, and such other witnesses may then testify that the house was visible from the place so pointed out.

Id.—Evidence of Nonkilling by Another.—Where the evidence shows conclusively that the deceased must have been killed either by the defendant or by another person, the latter may testify that he did not do it.

Id.—Evidence Tending to Degrade Defendant.—To ask the defendant on cross-examination, while a witness in his own behalf, whether at the time of the homicide he was living with a woman who was not his wife is prejudicially objectionable. Such objection is cured, however, if the defendant's own witnesses testify to the same effect.

Id.—New Trial—Newly Discovered Evidence.—The order denying a new trial in this case, on the ground of newly discovered evidence, will not be disturbed on appeal.

Id.—Instructions—Circumstantial Evidence—Reasonable Doubt.—An instruction "that if one set or chain of circumstances leads to two opposing conclusions, one or the other of such conclusions must be wrong," and that if the jury "have a reasonable doubt as to which of said conclusions the chain of circumstances leads," they should acquit the defendant, is properly refused, as both of such opposing conclusions might lead to defendant's guilt.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. B. N. Smith, Judge.

The facts are stated in the opinion of the court.

D. Allen, and W. H. Shinn, for Appellant.

Tirey L. Ford, Attorney General, and C. N. Post, Assistant Attorney General, for Respondent.

GAROUTTE, J.—The defendant has been convicted of the crime of murder of the second degree, and appeals to this court.

It is earnestly insisted that the evidence does not warrant a conviction. The evidence was purely circumstantial, and the salient facts are these: One Joseph Hunter, a constable, lived in a four-room house near the public road, some three miles distant from the city of Los Angeles. The defendant, a young man of slight physique and weight, afflicted with a perceptible lameness in one leg, had been living with Hunter for some weeks. Upon the day of the killing Hunter was in the city of Los Angeles, the defendant being alone at the house. During the early part of the day defendant borrowed a shotgun of one neighbor and four loaded shells of another, stating his purpose was to shoot squirrels; and during the early afternoon he undoubtedly fired two of these shells at squirrels near the house. Between 5 and 6 o'clock of this day, a Chinese laundryman drove up to the house for the purpose of delivering laundry, as was his usual weekly custom. He went into the house with the laundry and never came out. His horse stood in front of the house for an hour or more, and then wandered away aimlessly down the road. Upon the following morning suspicion of murder became rife in the neighborhood, and upon the third or fourth day thereafter the dead body of the Chinaman was found concealed beneath the floor of the house. Death had resulted from two shotgun wounds inflicted with the borrowed gun and two of the borrowed shells. At some time between the hours of 5 and 6 o'clock of this day, and after the Chinaman had entered Hunter's house, one witness heard two shotgun shots, apparently coming from within the house, and other witnesses heard at least one shot coming from the same direction. Two bed sheets, evidently taken from defendant's bed, were found wrapped around the head and shoulders of the dead man. Spots of blood were found at various points in the house, and evidence of an attempt to conceal and erase them was apparent. Indeed, there is no question but that the Chinaman was killed in the house by gunshot wounds inflicted with the borrowed gun and shells. Defendant made many false statements when questioned by

the officers after the killing, and also made a bold effort to escape from their custody. He was seen at the house by one witness a few minutes after the two shots were heard, although he claims to have left the house soon after the Chinaman had entered it, and not to have returned until an hour or two later. About 10 or 11 o'clock of that night at the house he showed a woman friend considerable silver money; and the theory of the state is that the purpose of the killing was robbery. Hunter returned to his house drunk at some time between 7 and 8 o'clock of that night. There are other items of evidence looking toward defendant's guilt which it is not necessary to here detail. If the Chinaman was killed between the hours of 5 and 6 o'clock of that afternoon, or even as late as 7 o'clock, the defendant's guilt is well assured, and that the gunshots heard by the aforesaid witnesses as coming from the direction of the house caused the death of the Chinaman is equally well assured. There were but four loaded shells for the gun, and two of these shells had been fired early in the afternoon at squirrels. The remaining two shells were the shells used in the killing. Defendant by his counsel claims that Hunter killed deceased, but that theory is confronted with the fact that Hunter did not return to his house until after 7 o'clock at least, and the two shots from the gun, as testified to by the witnesses, must have been fired previous to that time. While the fact cannot be considered upon the question of the sufficiency of the evidence to support the verdict, still it may be mentioned that the correctness of the jury's disbelief in the evidence of defendant as to his alibi was subsequently impregnably forfeited by his own affidavit introduced upon his motion for a new trial, wherein, under oath, he admitted his testimony at the trial was false, and stated that he was present at the killing, and saw Hunter fire the shots that killed the deceased, and subsequently stood by when Hunter concealed the dead body. We have given the salient facts disclosed by the record. In addition to these, there are many others of minor importance, and, taking them altogether, we are prepared to say that the verdict of the jury has full support in the evidence.

A witness under objection was asked the following question: "Q. Could you tell from the sound of the shots about where

they were, whether they were in the house or out of the house?" The objection was properly overruled. (*People v. Chin Hane,* 108 Cal. 597.) The witness was also justified in testifying that the shots sounded like those fired from a shotgun. Even if it be conceded that this evidence should only come from the mouth of an expert, still there was no objection to the question upon that ground, and the witness also stated that he was able to distinguish by the sound the difference between shots fired from a shotgun and those fired from a rifle.

The witness Le Page testified that he was sitting upon a rock several hundred feet from Hunter's house when he heard the shots fired, and that a few minutes thereafter he saw defendant come out of the house, look into the wagon of the Chinaman, and then return into the house. The defendant offered evidence to the effect that a person sitting on the rock described by the witness could not see Hunter's house. The location of this particular rock, therefore, became very material; and in rebuttal Le Page testified that he pointed out to the state's witnesses the rock upon which he was sitting when he saw defendant at the house. These witnesses then testified that the house could be seen from the rock pointed out by Le Page. We see no valid objection to this line of testimony.

There was no error committed by the court in allowing the prosecution to prove by Hunter that he did not kill the Chinaman. It may be said the evidence points with unerring certainty to the fact that either the defendant or Hunter killed the Chinaman. Indeed, counsel for defendant all through the trial of the case claim that deceased must have been killed by Hunter. Under these circumstances the testimony of Hunter was competent and admissible. (*People v. Van Horn,* 119 Cal. 323, 328.)

The defendant when on the witness stand was asked in regard to one Miss Letitia Allec: "Q. You were living there with her, was you not?" The question was clearly objectionable, and clearly prejudicially objectionable. An attorney cannot degrade or impeach a witness in this way. Under almost any circumstances, other than those here presented, this error would demand a reversal of the judgment and a new trial of the defendant. This court has held questions of this character prejudicially objectionable so many times in the past that

it is surprising the state's officers will continue to indulge in
the practice of asking them.   In the very recent case of *People
v. Crandall,* 125 Cal. 135, the whole matter is fully discussed
and the authorities cited.   But in view of the fact that other
evidence of the same general tenor was introduced upon the
part of the defendant, we think it apparent that the error
committed by the trial court in the admission of the answer to
this question did not prejudice him.   The record discloses by
the evidence of defendant's witnesses that this woman had
been living a portion of her time prior to the killing at Hun-
ter's house with defendant.   The woman herself testified in
answer to defendant's counsel: "About two weeks before the
shooting I remember riding from the city with Joe Hunter
toward his place.   At that time and between the city and his
place, on the road, he said to me, 'Why don't you get rid of
Harry?   He hasn't got any money, and if you get rid of him,
I will give you all the money and fine clothes you want.'   He
also said on the same occasion that Harry was no good only
for his good looks."   And upon cross-examination she says:
"Joe Hunter didn't say to me that I had better marry Clark.
He wanted me to quit Harry and go with him.   That is all."

Defendant made a motion for a new trial upon the ground
of newly discovered evidence, and in support of his motion
presented many affidavits.   He himself made an affidavit to
the effect that his testimony bearing upon his claim of an
alibi was false, and that he was present in the house and saw
Hunter kill the Chinaman and subsequently conceal the body.
As tending to furnish statutory grounds for a new trial, we
attach no importance whatever to this affidavit.   The court
below evidently had but little doubt of its falsity.   Indeed, it
appears by the record that subsequent to defendant's convic-
tion Hunter was tried for the murder of the Chinaman and
acquitted, the jury evidently not believing defendant's testi-
mony, which was in line with his affidavit here under consid-
eration.   We have also examined the contents of the other affi-
davits introduced by him as showing newly discovered evi-
dence.   As to some of them, for example that of Anna Bibby,
it may well have impressed the trial court as being entirely
unbelievable.   Others contain matters of minor importance,

and still others set out matters of an entirely cumulative character. In view of the law by which this court is governed in reviewing a question of this character, we will not disturb the order denying the new trial upon the ground of newly discovered evidence. (*People v. De Maslers,* 109 Cal. 607.) We do not find it necessary to pass upon the admissibility of certain counter-affidavits offered by the state upon the hearing of the motion.

Complaint is made of the court's refusal to give the following instruction: "The court instructs the jury that if one set or chain of circumstances leads to two opposing conclusions, one or the other of such conclusions must be wrong; and therefore in such a case, if you have a reasonable doubt as to which of said conclusions the chain of circumstances leads, a reasonable doubt would thereby be created, and you should give the defendant the benefit of such doubt and acquit him." In view of the fact that both of these "opposing conclusions" might lead to defendant's guilt, the instruction for this reason alone was properly refused.

There is no substantial error disclosed by the record.

For the foregoing reasons the judgment and order are affirmed.

Van Dyke, J., McFarland, J., Harrison, J., and Henshaw, J., concurred.

Rehearing denied.