[Civ. No. 14753.  First Dist., Div. One.  Sept. 14, 1951.]

RUTH NOBLE, Respondent, v. CAVALIER RESTAURANT et al., Defendants; AMERICAN HOG COMPANY (a Copartnership) et al., Appellants.

Hadsell, Murman & Bishop for Appellants.

Sullivan, Roche, Johnson & Farraher for Respondent.

BRAY, J.—Insufficiency of the evidence to support the verdict and judgment is the principal contention on this appeal by defendant American Hog Company, a copartnership, and the individual partners, from a judgment in favor of plaintiff in the sum of $4,000.

### RECORD

Plaintiff sued said defendants, the Cavalier Restaurant and the Scavengers' Protective Association, a corporation, for damages for injuries claimed to have been received when she slipped and fell on garbage lying on the sidewalk in the rear of said restaurant. At the end of plaintiff's opening statement all defendants moved for a nonsuit, which was denied. They again moved for a nonsuit at the end of plaintiff's case, and for a directed verdict. Defendant Cavalier Restaurant's motion was granted. The others were denied. The jury found in favor of defendant Scavengers' Protective Association and awarded plaintiff $4,000 damages against the American Hog Company and its owners.

### EVIDENCE

Defendants contend that there is no evidence connecting them with the material upon which plaintiff slipped. There are two doors, one large, the other narrow, at the rear of the Cavalier Restaurant, which open on the sidewalk on Eddy Street. The accident happened about 20 minutes to 9 on the morning of January 6, 1948. Plaintiff testified that while walking on the sidewalk in front of the narrow door she slipped and fell, experiencing "terrible pain." She immediately asked that the manager be called. He was. When she got up her shoes, coat, dress and purse were full of "garbage." It was of the consistency "of mashed cabbage, spinach or lettuce, it was something leafy." She looked at the

sidewalk at the point where she fell and on it "was a kind of squashed area of leafy stuff, mashed down, where you could see I slipped in it." "It was . . . a dark greenish color, with some, apparently, lettuce leaves in it, too." "It could be any leafy material," "not dry." "I would call like cabbage after it was cooked a long time, with grease and mashed up." She was certain the material was greasy. The material was grayish green, "ground up and greasy," "matted with grease." It had "a greasy odor," "stale smelling." There was a "skiddy" looking place where she had slipped.

Miss Huppner, who was with plaintiff, testified that she examined the pavement after the fall. "There were some green leaves there, some greasy stuff like, you know, just regular garbage." It gave the appearance of having been cooked. It looked like "fresh garbage." "It was grease and some greens on there, kind of a mixture." "It looked like plain garbage you would throw away in a garbage can." She located the spot where plaintiff fell as being in front of the large door, not the narrow door. The garbage area was about 12 inches in diameter. The material was dark green, flat, "more of a liquid" substance. ". . . there were small pieces there, and green leaves amongst them," "dirty like," and "a greasy type of liquid." The garbage was marred by only "one streak" where plaintiff had slipped.

Miss Brown, who also was with plaintiff, testified that when she started to pick plaintiff up she saw "all the grease." She placed the fall as occurring "When we passed just about the door there," referring to the larger door. She described the material as being "soft and green," "not runny." When asked what caused plaintiff to fall she replied "that grease on the ground . . ." She stated that the grease was not black, although two weeks after the accident she had signed a statement that it was "black and appeared hard."

Defendant Lomori, one of the partners in the American Hog Company, testified under section 2055 of the Code of Civil Procedure that the company purchased the garbage of the restaurant. On the day in question he and one Bernardini removed the garbage, also referred to as "swill," at approximately 3 :30 a. m. They removed one can of swill and one of greens. They took them out the narrow door across the sidewalk to the truck, which was directly in front of the door. The swill was in a 28-gallon can, which was about 18 inches wide and filled to about 3 inches from the top. The can of greens was about half full. While he did not examine

the sidewalk to see whether they had dropped anything, he remembered distinctly that they did not drop any garbage; "we couldn't drop anything." At the time he was working as relief for one Baccilli, who was sick. He worked two or three days; "I don't remember exactly." He learned about the case a couple of months after the accident. He then checked the records and found that Baccilli was sick that day, that no man had been paid in his place. Bernardini could not go by himself, so the witness must have gone on the truck. In the swill can was "mostly bread, potatoes, stuff of that kind, meat," no "liquid visible" or "any grease"; no "cooked cabbage, lettuce, spinach, anything of that nature." No grease was ever taken out of the restaurant, just "light swill."

A. Farrari, who worked on the truck of defendant Scavengers' Protective Association, testified, under section 2055 of the Code of Civil Procedure, that Scavengers pick up only dry garbage from the restaurant—paper cartons, paper, wood and tin cans, coffee grounds. They bundle this material in a piece of burlap. If they find something else in their garbage they put it in the wet garbage can. Scavengers' men never took from the restaurant any vegetables, cabbage or lettuce that had been cooked with grease, nor swill nor wet garbage.

A. H. Dingman, general manager of the company owning the Cavalier Restaurant, testified that he is responsible for the operation of that restaurant. Three different concerns took out the restaurant "refuse." Defendant hog company took garbage, "swill." Scavengers' took out "trash." South San Francisco Tallow Works took out "grease." Most of the hog swill came from plate leavings which were washed off by hot water in a device called a salvagor. Its function was to collect the swill in a perforated basket through which hot water constantly ran. At intervals this basket was dumped into the swill can which the hog company picked up. Fats went into the container for the tallow works. Trimmings from the vegetables—for instance making salads, peelings from the tomatoes, lettuce leaves, romaine lettuce, things of that kind, would be segregated and put into cans. Trim from the outer side of meats was thrown in the same place where the material from the salvagor went, as well as remnants of food prepared but not served. If cabbage or any similar type of food remained, it went into the garbage can into which the salvagor was emptied. ". . . greasy vegetable matter that appears to be ground up that contained grease of a greenish

color" was taken away by the hog company. In washing dishes the solid materials go into the salvagor and any grease is caught by the grease trap and goes into the tallow works container. It is more accurate to refer to the wet garbage as "damp" garbage. The restaurant never served any cooked lettuce or cabbage or spinach, or coleslaw, or celery. They did serve lettuce and onions.

The evidence showed that the only place from which foodstuffs or garbage could have come that morning was the Cavalier Restaurant.

It is unnecessary to discuss the testimony as to plaintiff's injuries, as no attack is made on the adequacy of the verdict.

EVIDENCE SUFFICIENT

■ The evidence substantially shows that the material carried out by defendant hog company included scrapings of foodstuffs from the plates (although washed by the salvagor in hot water it did not necessarily eliminate all the grease), trimmings from vegetables in making salads, fat which was trimmed from the outer part of meat, and foods remaining from the kitchen. Defendants insist that the testimony of Lomori proves that no material was spilled from the cans that morning. However, there is substantial evidence from which the jury might (and evidently did) find that plaintiff stepped on a leafy greasy substance which reasonably could have come only from those cans.

Defendants contend that the evidence shows (1) that the material carried out by defendant hog company was greaseless, and (2) that none of it was spilled. The testimony of Dingman shows that while grease, as grease, was removed as much as possible and went to the tallow works, nevertheless, enough grease was left in the hog company material to give it a greasy appearance. He testified, among other things, that greasy vegetable matter as described by plaintiff was included in the garbage that the hog company took away. Further, the jury was not bound to believe Lomori's testimony, particularly in view of the fact that material of the type Dingman said was taken by the hog company was found on the sidewalk and there appeared no reasonable explanation of how it got there other than that it came from the cans defendants had carried across the sidewalk about five hours earlier. This is not, as defendants contend, a situation where merely because plaintiff fell on garbage the hog company is

held liable. Rather it is one where, under all the circumstances, the only reasonable inference is that the material was spilled by defendants.

Defendants claim an analogy between the facts here and in the case of *McKellar* v. *Pendergast*, 68 Cal.App.2d 485 [156 P.2d 950], where defendants' motion for judgment notwithstanding the verdict was upheld. There the charge was that defendants negligently permitted an oily substance to remain on the lobby floor. Plaintiff slipped on this substance and was injured. The plaintiff relied upon the mere fact that there was oily substance on the lobby floor. There was no proof that defendants' janitor had carried anything of an oily nature out in the garbage. In holding that plaintiff had failed to meet the required burden of proof the court pointed out (p. 489) : ". . . it is no more speculative to presume that the oily substance was dropped by another than it is to speculate that the janitor dropped it." The main distinction between the two cases is that here it was shown that on that very morning defendants carried the substance which caused the injury over the place of injury, and in all reasonable probability, it could not have been on the sidewalk unless dropped by defendants. It is not a case of speculation. Rather it is one of reasonable inferences from strong circumstantial evidence.

## OTHER CONTENTIONS

### 1. Opening Statement.

Defendants contend that their motion for nonsuit at the end of plaintiff's opening statement should have been granted. Plaintiff's statement left considerable to be desired as to completeness. However, plaintiff did state generally that she would prove that defendants early that morning carried out of the restaurant substances which were food from the restaurant and remains of patrons' food washed off their plates, referred to as "edible swill"; that plaintiff slipped upon some substance on the sidewalk near the restaurant door; that it was of a grayish green, slightly greasy appearance; it did not appear to be fresh vegetables, but was mashed up and not distinguishable as to a single leaf. It is true that plaintiff did not state she would prove the allegations of the complaint to the effect that defendants so negligently removed garbage from the restaurant as to leave portions of it lying on the sidewalk. However, it was obvious from the statement that plaintiff intended to connect up the fact that defendants removed swill that morning with the "grayish green, slightly

greasy appearing substance" upon which she slipped. While the statement was not full and complete, it was sufficient to show generally what the case was about. It did not purport to be a complete summary of the evidence. . A motion for nonsuit on an opening statement should not be granted unless it appears that plaintiff cannot prove a cause of action. The statement of plaintiff, although rather meagre, was not in this category. As said in *Paul* v. *Layne & Bowler Corp.*, 9 Cal.2d 561 [71 P.2d 817], cited by defendants (p. 566): ". . . it may fairly be said that plaintiff's counsel did not purport to set forth all that he expected to prove." Moreover, plaintiff did prove a case. The error, if any, was not prejudicial.

*2. Failure to Prove the Allegations of the Complaint.*

■ Defendants contend that their motions for nonsuit and directed verdict should have been granted for failure of plaintiff to prove the allegations of the complaint. As hereinbefore discussed, plaintiff did prove her case, so there was no error in the denials of these motions.

*3. Verdict Contrary to Law.*

Defendants rely on *Larson* v. *St. Francis Hotel*, 83 Cal.App. 2d 210 [188 P.2d 513], where a pedestrian on the sidewalk outside that hotel was struck by a heavy chair which must have come from an upstairs window. The granting of a motion for nonsuit was upheld for the reason that plaintiff merely proved the happening of the accident. There was no evidence, either direct or indirect, that the chair was thrown out by a hotel employee. The court pointed out that a hotel does not have exclusive control, either actual or potential, of its furniture, and that "the mishap would quite as likely be due to the fault of a guest or other person as to that of" the hotel employees. (P. 212.) Here the defendants' employees were shown to have been in a position to cause the accident, and the probability that anyone else could have caused it was extremely remote.

Instructions

Defendants complain of the failure to give certain instructions. They admit that the court properly instructed upon the requirement that the jury must find in favor of defendants if the evidence failed to show they were responsible for the presence of the garbage on the sidewalk. ■ Defendants' proposed instructions 8 and 9 were on the subject of unavoidable accident. They fail, however, to point out what

facts would have justified a finding of unavoidable accident. Here the injury was caused by a substance on the sidewalk which could only have been there through the negligence of someone. Hence the accident could not have been an unavoidable one. ■ Defendants argue that the court should have instructed the jury that plaintiff could have been injured because of an accident for which none of the defendants was liable. The unavoidable accident instructions did not discuss this subject. Defendants did not offer any instruction which did. Moreover, the court did instruct that the mere happening of the accident or the sustaining of injuries raised no presumption of negligence. It also instructed fully upon the subject of negligence including an instruction to the effect that if the jury found defendants not guilty of negligence which proximately contributed to the accident, their verdict must be for defendants.

■ Defendants' proposed instruction 2 set forth the charging allegations of plaintiff's complaint and defendants' denials thereof. While such an instruction is proper it is not necessarily essential. The statement in *Cody* v. *Market St. Railway Co.*, 148 Cal. 90, 94 [82 P. 666], applies here. "It may be conceded that *it is always entirely proper* for the trial court to state to the jury the issues to be determined by them, and it may be that in some cases, by reason of peculiar circumstances existing, such a statement would be necessary in order that the jury might clearly understand the particular questions to be decided; but we see nothing in the record of this case to indicate that such a statement by the court was at all necessary. The issues made by the pleadings were exceedingly simple, there was apparently no dispute between the parties as to what they were, and presumably, in the absence of anything to the contrary in the record, they had been correctly stated to the jury by counsel. (Code Civ. Proc., § 607.)" (Italics added.) The court in its instructions fully informed the jury of the issues in our case and therefore it was unnecessary to discuss the pleadings.

■ Defendants' proposed instruction 3 sets forth in detail plaintiff's burden of proof as regards defendants. The subject of plaintiff's burden of proof as to all defendants was fully covered in the instructions given, one of which was defendants' instruction 7. There was no error in refusing any of the foregoing instructions.

■ A more serious situation arises with reference to the instructions given to the effect that a violation of sections 6

or 33 of the San Francisco Police Code constitutes negligence as a matter of law. It is doubtful if these sections are applicable to the situation here. Section 6 provides: "It shall be unlawful for any person to throw any banana peel or orange peel or other rubbish on any sidewalk . . ." Section 33 provides: "It shall be unlawful for any person or persons to sweep, throw or brush onto any sidewalk any rubbish, paper, sweepings or dirt, or to brush, sweep or throw any rubbish, papers, sweepings or dirt into any street, alley, gutterway or passage." In these sections the only word which might apply here is "rubbish." ". . . banana peel or orange peel or other rubbish" in section 6 could very well include vegetable refuse. Funk & Wagnall's New College Standard Dictionary, 1947 edition, includes in its definitions of "rubbish": "waste, refuse." These sections apparently require that the deposit of rubbish on a sidewalk be an intentional act as they make it unlawful only "to sweep, throw or brush." Assuming that the reading of these sections was error, it was error without prejudice. Under the facts of this case the dropping of the material in question by defendants in removing it from the restaurant could only have been negligently done. Hence, once the jury found that it was dropped when the cans were carried out, a finding of negligence must necessarily follow, and the court's intimation that it might be a violation of the ordinance and hence negligence as a matter of law was not prejudicial. Under section 4½ of article VI of the Constitution, the reading of these sections could not have been prejudicial as undoubtedly the verdict would have been the same had they not been read.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.